IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGIANNE LAKATOS, *et al.*, | | |
| Plaintiffs, | | Case No. 10 C 6393 |
| v. | | Hon. Harry D. Leinenweber |
| UNITED STATES OF AMERICA and JAY MEDICAR TRANS. LLC, | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Jay Medicar Transportation LLC's (hereinafter "Jay Medicar") Motion for Summary Judgment. For the reasons stated herein, the Motion is denied.

## I. BACKGROUND

This is a wrongful death suit that was brought by Georgianne Lakatos and Daniel Freeland, Trustee in Bankruptcy for Andrew Lakatos Jr., as Co-Administrators of the Estate of Andrew Lakatos (hereinafter, collectively, the "Plaintiffs.") Plaintiffs are suing the United States for medical negligence under the Federal Tort Claims Act, and this Court is exercising pendant jurisdiction over their medical negligence claim against Jay Medicar. Plaintiffs' claims against the United States are not at issue here.

The following facts are taken from the parties' Local Rule 56.1 statements, deposition testimony, and exhibits, with disputes noted where applicable. Andrew Lakatos ("Lakatos") was

discharged from Edward Hines Jr. V.A. Hospital in Hines, Illinois, ("Hines Hospital") on November 25, 2009. Jay Medicar, a transportation service for patients going to and from Hines, transported Lakatos from the hospital to his home in Lake Station, Indiana. Shortly after Lakatos' arrival home, he collapsed. He died the same day. Jay Medicar seeks summary judgment on the ground that it owed no duty of medical care or treatment to Lakatos when transporting him from the hospital to his home. While Jay Medicar admits that its driver was required to monitor Lakatos during transport and call for help if he observed signs of distress, it contends that Plaintiffs put forth no evidence to show that Lakatos experienced distress during the trip.

## A. The Contract

In February 2009, Hines Hospital entered into a contract with Jay Medicar in which the latter agreed to provide wheelchair van transportation to Hines' patients. The contract was extended to September 10, 2011 by an amendment dated April 1, 2010. The contract provided that the Jay Medicar driver should assist the patient in entering and exiting the van. It also provided that service should be "through the door," meaning that patients should be helped inside their homes at the conclusion of the trip. (The Court notes, however, that Jay Medicar dispatcher Larry Hawkins testified in his deposition that Jay Medicar drivers were required to help passengers out of the van and perhaps to their front steps, but drivers were not to enter passenger's homes. This seems to

conflict with the contract's express requirement that "at the conclusion of their appointments the patient [sic] will be returned to the ward, inside his/her home, or other stated areas.") *See* Ex. B to Def.'s Mot. for Summ. J., at 11.

The contract provides for certain vehicle specifications, including necessary equipment and maintenance standards. Under the terms of the contract, Jay Medicar drivers are not required to have any advanced medical training. They are required to take a basic first-aid class and complete a training program on transporting elderly, disabled individuals. *See id.* at 10.

The contract required that the driver must ensure that Jay Medicar would transport "patient luggage, medical records, medications, prosthetic devices and comfort items from pickup points to destinations at no additional charge to the Government." *See id.* at 13. Additionally, it is undisputed that Jay Medicar's policies required Lopez to pull over and call 911 if a passenger appeared to be in medical distress. *See* Lopez Dep. at 13:13-14:5.

## B.  Treatment and Transport of Lakatos

On November 23, 2009, Lakatos was admitted to the emergency room at Hines Hospital. He was treated by doctors at the hospital, including Drs. Jeffrey Naour ("Naour"), Emily Tuerk, Paul Nemeth, and Scott Pawlikowski. As part of his treatment, Lakatos' doctors put him on an oxygen machine. It is not clear from the parties' briefing what caused Lakatos' death, although Naour's deposition

testimony indicated he suffered from lung cancer, sleep apnea, and poor cardiac functioning.

Regardless, on November 25, 2009, it is undisputed (at least for the purposes of this motion and by these parties) that Hines Hospital discharged Lakatos without supplemental oxygen. Naour testified that the failure to provide supplemental oxygen upon discharge would amount to a breach of the standard of care. Naour testified that regardless of how long the trip was, Lakatos would have needed supplemental oxygen.

The Jay Medicar driver who transported Lakatos, Angelo Lopez ("Lopez"), testified in his deposition, taken in September 2011, that he could not remember anything about Lakatos or transporting him. He could not recall the dispatcher giving him any specific information about Lakatos or any conversations with anyone at Hines Hospital related to Lakatos' transport.

Lopez testified that he was trained to look at and communicate periodically with his passengers. If he saw that a passenger was in medical distress, he was required to pull over and call 911. In the past, he had on rare occasions refused to transport a passenger – once because the passenger was paralyzed and could not be transported without an escort and once because the passenger had a contagious disease.

It is undisputed that Lakatos was transported with two other passengers and was the last passenger dropped off. Although he could not remember the trip in question, Lopez testified after

looking at his "trip sheet" that the trip took about an hour and 15 minutes. Generally speaking, Lopez determined the route he took when he dropped off passengers and the order in which they would be dropped off. Lopez would frequently get special instructions from the dispatcher, such as if the patient required oxygen or special assistance. Lopez would go into the hospital to get the patients, and he would ask them whether they had everything they needed. He testified that it was his practice to check on passengers about every four minutes, and if a passenger did not respond because he or she was asleep, Lopez would wake up the passenger.

Lopez could not recall ever having transported a passenger who was so oxygen-deprived that the passenger's skin turned blue. He testified that if anything unusual happened during a trip, he would fill out an incident form and report it to his supervisor right away.

Prior to his deposition, on June 29, 2011, Lopez signed an affidavit exhibiting a much clearer recollection of the events of the day in question. Specifically, he averred that Lakatos appeared fit for transport and exhibited no signs of distress during the trip. At no point did Lakatos express any discomfort. Lopez averred that when the trip concluded, he assisted Lakatos out of the vehicle and inside his home. At this point, Lakatos did not exhibit any signs of distress or tell Lopez he was experiencing discomfort.

Larry Hawkins ("Hawkins"), a dispatcher for Jay Medicar, also testified in his September 2011 deposition that he remembered nothing about the Lakatos transport. Hawkins testified that if a driver determined that a patient was in distress, he should go to the nearest medical facility. Hawkins testified that Jay Medicar has transported patients requiring supplemental oxygen in the past, but it was the patient's or hospital's responsibility to ensure that the patient had his or her oxygen tank.

In an affidavit dated June 28, 2011, Hawkins averred that Hines Hospital did not provide him with any specific information indicating that Lakatos required special care, and that he did not receive any calls from Lopez indicating that Lakatos was in distress.

Georgianne Lakatos, ("Georgianne") the decedent's former wife, was living with him at the time of his death. (Although they were divorced, she and Lakatos lived together as spouses.) She testified that Lakatos was first prescribed a home oxygen tank in 2008. In November of 2009, he was using supplemental oxygen about once a week, she said. Georgianne recalled that on November 25, 2009, Lakatos called her to tell her he was being discharged and that the hospital was arranging his transportation. The next time she heard from him was about an hour and a half or two hours later, when Lakatos called to tell her that he was a few minutes away from their home. Georgianne said that it actually turned out to be a "little longer" than a few minutes before Lakatos arrived home. It

was a short conversation, and Lakatos did not express to her any complaints about how he was feeling.

When Lakatos arrived home, according to Georgianne, he tried to get out of the van and was wobbly and unsteady. She noticed that his face was blue and "he looked like he didn't have oxygen, like somebody who has a lack of oxygen. He didn't look right." Georgianne Lakatos Dep. at 73:17—25.

Georgianne testified that the Jay Medicar driver was standing outside the van and did not help her get Lakatos inside the house. She and their son helped Lakatos up the stairs to the house. Georgianne was worried about how Lakatos appeared and asked him what was wrong, but he did not answer her. Lakatos went to the bathroom, and when he got out, Georgianne asked him what medication he was on because he appeared so unsteady. Lakatos replied, "I don't know," and then collapsed, according to Georgianne. This occurred less than five minutes after Lakatos got out of the transport van, she testified. Paramedics were called, and he was taken to St. Mary's Medical Center in Hobart, Indiana, where he died later that day.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate where the record shows that there is no genuine dispute as to an issue of material fact. FED. R. CIV. P. 56(a). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict

for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on summary judgment, the court does not weigh the evidence or determine the truth of the matter, but determines whether a genuine issue of material fact exists that warrants trial. *Id.* at 249. In addressing a motion for summary judgment, the court must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998). A genuine issue of fact, however, is not shown by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the burden of establishing the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on mere allegations, but must present specific facts showing that a genuine issue exists for trial. *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). To support their positions that a genuine issue of material fact does or does not exist, the parties may cite to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, and interrogatory answers, or show that

the materials in the record do or do not establish a genuine dispute. FED. R. CIV. P. 56(c).

### III.  <u>ANALYSIS</u>

As a preliminary matter, the Court notes that both Lopez and to a lesser extent Hawkins submitted affidavits in response to summary judgment that contradicted their deposition testimony that they did not remember transporting Lakatos on November 25, 2009.

The Court is particularly concerned about the conflicts between Lopez's affidavit and his deposition testimony. Jay Medicar provides no explanation as to how Lopez's memory became so much worse in the few months between signing his affidavit and testifying. Regardless, affidavits submitted in summary judgment proceedings must be based on personal knowledge, and if Lopez's deposition testimony is true, it is hard to see how his affidavit could be based on personal knowledge, as least in regard to the events surrounding Lakatos' transportation. *See MCI Worldcom Network Servs., Inc. v. Atlas Excavating, Inc.*, 02 C 4394, 2005 WL 1300766, at *4 (N.D. Ill. Feb. 23, 2005).

Additionally, it is well settled that a party who denies knowledge of events or circumstances during a deposition cannot later submit a self-serving affidavit asserting such knowledge in an effort to avoid summary judgment. *See, e.g., Muska v. AT&T Corp.*, No. 96 C 5952, 1998 WL 544407, at *6 (N.D. Ill. Aug. 25, 1998). It seems to the Court that an affidavit that contradicts the affiant's sworn statements similarly cannot be used to *support*

summary judgment. *See Illaraza v. Anthony Crane Int'l*, Nos. 2007–CV–125, 2008–CV–59, 2011 WL 4479254, at *2 (D. V.I. Sept. 26, 2011). One possible course of action would be for the Court to disregard Lopez's affidavit, and instead consider his deposition testimony in determining the existence of a genuine issue of material fact. However, as will be discussed, the Court is concerned that these inconsistent statements also raise a factual issue about the credibility of Lopez, a key witness in this dispute.

## A. Existence of a Common-Law Duty

Jay Medicar bases its motion for summary judgment on its argument that it had no duty to administer medical care to Lakatos. Under Illinois law, in order to state a legally sufficient claim for negligence, a complaint must allege facts establishing the existence of a duty of care owed by the defendant, a breach of that duty, and an injury proximately caused by that breach. *Iseberg v. Gross*, 879 N.E.2d 278, 284 (Ill. 2007). The question of whether a duty was owed is question of law. *Id.*

Plaintiffs assert that Jay Medicar had — and breached — a duty: (1) to make sure that Lakatos had his oxygen tank during the trip home; and (2) to report any incidents of patient distress during the trip. Plaintiffs base these duties on Jay Medicar's contract with Hines Hospital as well as several other common-law theories: (1) the voluntary undertaking doctrine; (2) Jay Medicar's duty as a private carrier; (3) because of the alleged

- 10 -

"custodian-ward" relationship arising from the transportation of Lakatos; and (4) the traditional duty analysis.

Jay Medicar responds that the duty of care it owed to Lakatos is limited by its contract with Hines Hospital. *See Thompson v. Gordon*, 948 N.E.2d 39, 51 (Ill. 2010). In *Thompson*, the Illinois Supreme Court held that the scope of an engineering firm's duty in a lawsuit for negligent road design brought by the relatives two people killed in a car crash was limited by the contract between the developer and the engineer. *Id.*

Jay Medicar argues that the same principles apply here, and that the contract between it and Hines Hospital sets the outer limits of its duties. Plaintiffs respond that *Thompson* should not be read so broadly "as to immunize a medicar for acts of negligence it commits against its passengers," but do little to develop this argument.

The principles of *Thompson*, and the cases upon which it relied, *see Ferentchak v. Village of Frankfort*, 475 N.E.2d 822 (Ill. 1985), apply to cases in which the issue was whether engineers were required to answer to third parties who were injured while using projects designed by the engineers. It is far from clear to the Court that the only duties imposed on Jay Medicar in regard to its passengers should be those in its contract with Hines Hospital. However, the Court need not decide this issue. The additional sources of duty cited by Plaintiffs either are inapplicable or add little to the contractual duties already

imposed on Jay Medicar, particularly because Jay Medicar admits that its drivers have a duty to monitor passengers and summon help in the event of an emergency.

For example, the voluntary undertaking doctrine provides that a person who undertakes "gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking." *Rhodes v. Ill. Central Gulf R.R.*, 665 N.E.2d 1260, 1273 (Ill. 1996). However, the doctrine is construed narrowly, and is a means to impose a duty where it would not otherwise arise. *See Torres v. City of Chi.*, 816 N.E.2d 816, 818 (Ill. App. Ct. 2004)*; Ordman v. Dacon Mgmt. Corp.*, 633 N.E.2d 1307, 1310 (Ill. App. Ct. 1994). So the voluntary undertaking doctrine is inapplicable here because there clearly are contractual duties.

Next, Plaintiffs point to an alleged "custodian-ward" relationship arising from Jay Medicar's transport of Lakatos. This relationship arises when a person voluntarily takes custody of another under such circumstances as to deprive the other of his normal opportunities for protection. *See Fancil v. Q. S. E. Foods, Inc.*, 328 N.E.2d 538, 542 (Ill. 1975) (describing special relationships which may give rise to a duty to protect another from a risk of harm).

In arguing the existence of a custodian-ward relationship, Plaintiffs liken this case to *Jackson v. Ill. Medi-Car, Inc.*, 300

F.3d 760, 765–66 (7th Cir. 2002), where the court held that a medical transport company driver was not deliberately indifferent to a detainee's serious medical needs when he refused the detainee's requests to take him to a hospital and instead followed police instructions to take him to the station. The Seventh Circuit noted that the primary responsibility for the detainee rested with the police officers who were his custodians. *Id.* at 766. It was the officers who decided not to take the detainee to the hospital even though he had swallowed pills, and the medical transport driver had no indication the detainee was in distress during the transport. *Id.* Given the driver's lack of medical training and the fact that the detainee showed no outward signs of distress, there was no basis for imposing liability. *Id.*

Plaintiffs argue that unlike in *Jackson*, Jay Medicar had authority over Lakatos because it dictated his path home. The Court is skeptical as to whether a custodian–ward relationship exists in regard to a medical transport van and its passengers, but ultimately it does not matter. The key issue here is whether Lopez observed any signs of distress from Lakatos; the parties agree that if he did, then he was obligated to take action. This is a duty that Jay Medicar admits it owed under its contract with Hines Hospital. Plaintiffs fail to establish any additional relevant duties that would flow from a custodian-ward relationship, even if it existed here.

Finally, Plaintiffs urge that under a traditional duty analysis, Jay Medicar had a duty to assess Lakatos' oxygen need and to provide supplemental oxygen, as well as to monitor Lakatos during the trip. As noted, the duty to monitor is undisputed, at least as a matter of contract, but Jay Medicar strongly disputes that it had a duty to assess Lakatos' oxygen needs either under the contract or at common law. As for the common law duty of care, courts consider four facts to determine whether a duty exists: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057 (Ill. 2006). "The existence of a duty turns in large part on considerations of public policy." *Id.* Plaintiffs acknowledge that Jay Medicar's staff is not medically trained, and articulate no convincing basis as to why the company should have a duty to assess independently a patient's oxygen needs. As Jay Medicar argues, imposing such a duty at common law would essentially transform non-medical transport vehicles into ambulances, at great expense to the transport companies and ultimately to their customers. This is unsupportable, and the Court cannot fathom that the Illinois courts would impose such a duty. Plaintiffs also cite Jay Medicar's duty as a private carrier, but this duty would extend only to ordinary duties of care. Finding a private carrier duty would not aid Plaintiffs' case, then, in light of the Court's analysis as to the

extent of the duty of ordinary care.  So the Court will turn to the duties imposed under the contract between Jay Medicar and Hines.

### B.  Defendant's Duty under the Hines Contract

First, the parties dispute whether, even in the absence of a common-law duty, the contract independently imposed a duty upon Jay Medicar to make sure Lakatos had his oxygen tank with him when he was transported home.  The Court agrees with Jay Medicar that Plaintiffs stretch the contractual language too far when it asserts that such a duty existed.

Plaintiffs point to this language from the contract: "Contractor shall transport patient luggage, medical records, medications, prosthetic devices and comfort items from pickup points to destinations at no additional charge to the Government." *See* Ex. B to Def.'s Mot. for Summ. J., at 13.  The contract also provides that:  "When transporting patients to or from Medical facilities, the driver, acting for the Contractor, shall ensure that the patient's luggage, medical records, medications, and prosthetic devices are properly accounted for and delivered with the patient as required." *See id*.  The Court, however, cannot accept Plaintiffs' argument that these provisions come anywhere close to requiring Jay Medicar to determine independently that a patient required oxygen and obtain it for him even if doctors discharged him from the hospital without it.

Rather, the Court agrees with Jay Medicar that these provisions are meant simply to require drivers to help passengers

collect and transport their belongings.  It is undisputed that Jay Medicar drivers are not required to have advanced medical training, and there is nothing in the language of the contract that indicates that drivers should determine a passenger's medical needs.

Lopez did testify that if a patient told him he was unsure of whether he needed any medicine, Lopez would check with a nurse or doctor.  However, there is no evidence that Lakatos made any comments to Lopez about needing supplemental oxygen.  Where there is no evidence that either Hines Hospital staff or Lakatos himself told Lopez that he needed oxygen, there is no basis to conclude that Lopez himself should have made that determination.

It is undisputed that Jay Medicar drivers did have a responsibility to monitor patients for signs of distress, to call for help in the event of a medical emergency, and to report any such instances to their supervisors. Georgianne testified that her former husband was in evident distress when he arrived at their home and that there was no mistaking the blushish hue to his skin. Georgianne Lakatos Dep. at 74:15.  Viewed in the light most favorable to Plaintiffs, this is sufficient to raise a genuine issue of fact as to whether Lakatos was in distress during transport, such that Lopez should have called for help.

The Court notes that Plaintiff has not brought forth evidence to show when Lakatos' distress began.  Lakatos apparently did not communicate any distress to his former wife when he called her shortly before the medical van arrived at their home.  However,

under the contract between Jay Medicar and Hines, Lopez had a duty to monitor Lakatos for signs of distress that continued until Lakatos was inside his home because the contract called for "through the door" service. As such, although the evidence is thin, the Plaintiffs have presented some evidence that Jay Medicar failed to respond to a medical emergency. Given that the best Plaintiffs can show is that Lakatos was in medical distress at the end of his trip, whether Plaintiffs can prove that any negligence by Lopez in failing to call for help caused Lakatos death is another question, but one not raised by the parties here.

As noted above, the Court also is concerned about the evident inconsistencies between Lopez's deposition testimony and his affidavit. In his affidavit, Lopez asserted that Lakatos did not exhibit or communicate any signs of distress during the trip. He asserted that he assisted Lakatos into his home and that Lakatos was not in evident distress at that time, which is in direct conflict with Georgianne's testimony. More importantly, Lopez's affidavit raises the question of why Lopez did not offer any of these details during his deposition, when he could be questioned about them. The essential facts of what condition Lakatos was in during the last leg of the journey, when Lakatos and Lopez were the only ones in the vehicle, must come from Lopez. His credibility is obviously a key issue in this case, and it is doubt given his conflicting statements. *Cf. Cellini v. Moss*, 232 F.2d 371, 373 (D.C. Cir. 1956) (when, at trial, plaintiff may be able to elicit

from defendant facts that defendant had duty to observe and which may prove plaintiff's case, summary judgment is inappropriate). For these reasons, summary judgment is inappropriate.

## IV.  CONCLUSION

For the reasons stated, Jay Medicar's Motion for Summary Judgment is denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 1/23/2012